IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 2:16-cr-204 |
| ) | |
| ANDREW EDWARDS ) | |
| ) | |
| Defendant ) | |

# MEMORANDUM OPINION

Defendant Andrew Edwards renews his motion under 18 U.S.C. § 3582(c)(1)(A) in which he seeks compassionate release from his 156-month prison sentence. In his first motion, Edwards argued that his continued health problems resulting from a stroke in 2021 constituted extraordinary and compelling reasons warranting a reduction of his term of imprisonment. The Court denied the motion, holding that while "Edwards's condition is serious, his medical reports tell a story of a manageable condition that has improved and will continue to improve—despite the fact that some effects probably will be lifelong." Mem. Op., ECF No. 105 at 7. Even so, the Court denied the motion without prejudice, permitting Edwards to renew it "if his circumstances change or he has evidence to show his condition is deteriorating." *Id.* at 9.

Since then, Edwards suffered a "second neurologic episode," Renewed Mot. at 1—akin to a seizure—which he argues changed his health circumstances to such a degree that he now satisfies the extraordinary and compelling reasons requirement for compassionate release. The Government opposes Edwards's motion, emphasizing his recovery and participation in work and recreational activities after the seizure-like episode. Gov't Resp. to Renewed Mot. at 6–8. The Government also argues Edwards's sentence comports with the 18 U.S.C. § 3553(a) sentencing factors. *Id.* at 9–12. Before ruling on the motion, the Court asked Edwards to provide a status report as to his

1

medical condition by April 14, 2023. Order, ECF No. 117. Edwards complied, Status Report, ECF No. 118, and the Government responded, Response to Status Report, ECF No. 122. After reviewing Edwards's renewed motion and supplemental status report, the Court finds Edwards's medical condition does not satisfy the extraordinary and compelling reasons requirement and, thus, will deny his renewed motion.

I.     BACKGROUND

In the Court's September 2022 opinion denying Edwards's first motion for compassion release, the Court recounted in detail Edwards's conviction, sentence, and health condition. Mem. Op., ECF No. 105 at 1–4. This opinion fully incorporates the facts and procedural history described therein. To summarize, in June 2018, Edwards pleaded guilty to one count of possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1); one count of carrying a firearm in relation to a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A)(i); and one count of possession with intent to distribute a detectable amount of heroin and crack cocaine under 21 U.S.C. § 841(a)(1) and (b)(1)(C). *See* ECF Nos. 1 & 69. The Court sentenced Edwards to 156 months' imprisonment in accordance with the plea agreement. ECF No. 89 at 3. Excluding good-time credits, Edwards has served over half of his sentence, approximately 85 months. *See* Mot., ECF No. 99 at 2.

On October 3, 2021, Edwards informed an officer that he felt numb on the right side of his face and arm. Mot., ECF No. 99, Ex. B. at 33. Medical personnel at the facility noted several signs of a stroke. *Id.* at 33–34. Edwards was sent to a local hospital for evaluation and then transferred to another hospital "due to hemorrhagic stroke secondary to a venous sinus thrombus." *Id.* at 32. There, he underwent an "urgent craniotomy." *Id.*

After surgery, Edwards's symptoms were mixed. His vital signs were stable, and he could follow simple commands, but he still exhibited "right-side[] paralysis" and was "[a]phasic." *Id.* Throughout the following months, Edwards received physical, speech, and occupational therapy. *Id.* at 13–30. He required close supervision when using his wheelchair or shower chair, and he wore a helmet to protect himself from frequent falls. *Id.* at 25–26. In November 2021, Edwards was transferred to the Medical Center for Federal Prisoners in Springfield, a level 4 facility where he remains today.[1] *Id.* at 22–25; *see also* ECF No. 123 at 1. By January 2022, he was demonstrating improvement in his independent movement, though some lingering weakness and paralysis persisted. Mot., ECF No. 99, Ex. B. at 1–3, 10–12. In February 2022, Edwards faced a setback. He began having headaches and swelling on the left side of his head. Mot., ECF No. 99, Ex. C. at 12–15, 18. In April, medical personnel determined Edwards "suffer[ed] from craniectomy defect secondary to decompressive craniectomy" and developed a treatment plan including manufacturing an artificial graft "to fit his craniectomy defect" and scheduling a cranioplasty. *Id.* at 31–32.

Leading up to his cranioplasty, Edwards reached his "max potential" in physical therapy. *Id.* at 5. Nurses acknowledged his condition would be "lifelong." *Id.* at 28. But they noted in May 2022, Edwards was "very independent," "motivated," and "participat[ed] in PT [*i.e.* physical therapy]." *Id.* at 25. And Edwards's medical records in early August 2022 note that he actively participated in leisure activities such as yoga and gardening. ECF No. 113 at 142.

---

[1] The Bureau of Prisons has four levels of medical care that range from Level 1—inmates below seventy years of age who are generally healthy with limited medical needs—to Level 4—inmates who require "significantly enhanced medical services" and may need twenty-four-hour access to nursing assistance. Fed. Bureau of Prisons, Care Level Classification for Medical and Mental Health Conditions or Disabilities 2–3 (2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.

Edwards underwent a cranioplasty on August 9, 2022. *Id.* at 129. No complications were documented. *Id.* at 130. Two months after surgery, he reported feeling dizzy and experiencing his arm lock up while participating in outdoor recreation activities. *Id.* at 92. But by the next day, he was "feeling great": his symptoms "resolved completely with rest and water consumption." *Id.* at 83; *see also id.* at 7. That same month, Edwards reported better control of his right index finger due to the surgery. *Id.* at 80. His progress continued. Edwards graduated from needing assistance with activities of daily living. *Id.* at 74. And he began working as a rehab technician, helping to clean, mop, fold towels, and clean bathrooms. *Id.* at 62.

On November 28, 2022, Edwards was found "appearing to have a seizure and not responding." *Id.* at 55; *see also id.* at 51. Edwards reported a tingling sensation in his right leg after nurses assisted him to a standing position. *Id.* at 51. He was transferred to the local hospital, where he remained for two days. *Id.* at 422. During the visit, he was "alert" and "in no distress." *Id.* at 425. A doctor prescribed him Keppra, an antiseizure drug, and ordered an MRI. *Id.* at 422–23. The MRI revealed a "small area of hemorrhage," so the doctor ordered a follow up MRI in six weeks. *Id.* at 423. Edwards was instructed to resume Eliquis—an anticoagulant he had been taking—in two weeks if he remained stable neurologically. *Id.*

Edwards returned to MCFP Springfield on November 30, 2022; he reported, "I feel fine." *Id.* at 39; *see also id.* at 27. A physician noted a "strange request to hold Eliquis" in Edwards's records, but decided to take advantage of the prescription gap to order coagulation testing. *Id.* at 32. According to Edwards's medical records, he remains off anticoagulation medication. ECF No. 123 at 30. Edwards also experienced a three-day prescription gap related to his Keppra medication. On the Tuesday following Edwards's Wednesday discharge from the hospital, a nurse noticed Edwards's Keppra medication had only been ordered for November 30 through December 3. ECF

4

No. 113 at 23. So the nurse requested a physician to review whether the prescription should be renewed. *Id.* That same day, a physician agreed Edwards would continue Keppra, and confirmed there was "[n]o apparent harm from [the] Rx gap." *Id.* at 18–21.

As of January 9, 2023, Edwards had not experienced another seizure, nor suffered from headaches or blurred vision. *Id.* at 1. He reported occasional dizziness, but otherwise had "[n]o complaints." *Id.* at 1–2. Edwards was alert, oriented, and moved without assistance. *Id.* at 2. His cognition also appeared clear. *Id.* As such, a physician approved Edwards's request to work as a physical therapy aide. *Id.* at 1. A little over a week later, he underwent his scheduled MRI. ECF No. 123 at 30. The clinician concluded that based on the results, it "does not definitely appear the 11/28-11/30/2022 hospitalization was acute recurrent infarct or bleed." *Id.*

In March 2023, Edwards's "muscle weakness" persisted, but he had "[n]o worsening of symptoms" and "[n]o noticeable deficits with ambulation." *Id.* at 20. He "ambulated with a normal gait from [the] shower room to his cell," could "make his needs known," and "communicated effectively and appropriately with all staff." *Id.* During that month, he also received a "provisional diagnosis" of epilepsy. *Id.* at 15. So far as the Court can tell, he remains on Keppra, his antiseizure medication. *Id.* at 30. Edwards's most recent medical records show that in April 2023, he suffered persistent swelling in his right hand. *Id.* at 1–6.  The swelling caused Edwards "decreased sensation" in his right hand and "generalized discomfort." *Id.* at 1. Medical staff discussed treatment with Edwards such as elevating his hand when possible and performing certain exercises several times per day. *Id.* at 2. Edwards's next MRI is scheduled for no sooner than June 15, 2023. *Id.* at 15.

Prior to his first motion, Edwards submitted a compassionate release request to the warden of his facility, MCFP Springfield, on April 15, 2022. Mot., ECF No. 99, Ex. D. He moved for

5

compassionate release under 18 U.S.C. § 3582 in June 2022. Mot., ECF No. 99. The Court denied the motion in September 2022. ECF Nos. 105 (Opinion) & 106 (Order). Edwards renewed his motion on December 30, 2022, and he submitted a status report on April 14, 2023. He argues his latest neurological episode, involving seizure-like activity, constitutes extraordinary and compelling reasons for compassionate release, and a sentence of time served accomplishes the goals of sentencing under 18 U.S.C. § 3553(a).

## II.   LEGAL STANDARDS

A district court is typically forbidden from modifying a term of imprisonment after it has been imposed, "but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), amended through the First Step Act of 2018, Pub. L. No. 115-391, § 603, 132 Stat. 5194, 5239. This section gives courts the discretionary power to "reduce" a term of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant." § 3582(c)(1)(A).

If a defendant chooses the latter, before filing his motion he must "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [his] behalf" or wait until "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* Assuming the exhaustion requirement is met, a defendant must then show that "the sentence reduction is (1) warranted by 'extraordinary and compelling reasons'; (2) 'consistent with applicable policy statements issued by the Sentencing Commission'; and (3) supported by the traditional sentencing factors under 18 U.S.C § 3553(a), to the extent they are applicable." *United States v. Andrews*, 12 F.4th 255, 258 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 1446 (2022) (quoting § 3582(c)(1)(A)).

### III.    DISCUSSION

Neither Edwards nor the Government discuss § 3582(c)(1)(A)'s exhaustion requirement. As such, the exhaustion requirement does not block Edwards's renewed motion. Instead, the dispositive question is whether Edwards demonstrates that extraordinary and compelling reasons warrant his release. The Court holds he does not.

**Exhaustion**

Unlike in his first motion for compassionate release, Edwards has not demonstrated that he exhausted his administrative remedies or that thirty days have passed since the Bureau of Prisons received his second request for compassionate release. The Government, however, makes no mention of the statute's exhaustion requirement in its response to Edwards's renewed motion. Because § 3582(c)(1)(A)'s exhaustion requirement is generally considered a "mandatory claim-processing rule," it only bars Edwards's renewed motion when properly invoked by the Government. *See, e.g.*, *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021) (collecting cases that agree); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *United States v. Banks*, No. 21-2674, 2022 WL 832049, at *2 (3d Cir. Mar. 21, 2022) (citing *Sanford*). The Government has not done so here; therefore, the Court evaluates the merits of Edwards's motion for compassionate release regardless of whether he satisfied the statute's exhaustion requirement.[2]

---

[2] The same would be true under an alternative approach adopted by District Courts in this Circuit which finds the exhaustion requirement satisfied for renewed motions if "the BOP was on and has been on sufficient notice of [the defendant's] conditions such that review and consideration of the health issues [he] raises in his Renewed Motion is appropriate." *United States v. Hoover*, No. 2:18-CR-00188, 2022 WL 2826421, at *5 (W.D. Pa. July 20, 2022), *appeal dismissed sub nom. USA v. Hoover*, No. 22-2427, 2022 WL 18536147 (3d Cir. Oct. 7, 2022).

7

**Extraordinary and Compelling Reasons**

Edwards argues his "second neurologic episode confirms that his health is severely deteriorating and that his overall condition satisfies the 'extraordinary and compelling reasons' standard." Renewed Mot. at 1. The Court disagrees. Despite his isolated instance of seizure-like activity, Edwards's condition remains largely unchanged, perhaps even improved in some ways, since his last motion. Any lingering health problems do not supply extraordinary and compelling reasons for his release.

Edwards's renewed motion turns on the definition of "extraordinary and compelling reasons" in § 3582(c)(1)(A). The Court looks to the Sentencing Commission's policy statements to determine the meaning of the phrase. *See* 28 U.S.C § 994(t) (directing Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction").[3] Of the possible categories of extraordinary and compelling reasons, only one applies here: the defendant's medical condition. U.S.S.G. § 1B1.13 cmt. n.1. The policy statement explains that extraordinary and compelling reasons exist where the defendant is suffering from "a serious physical or medical condition" or "a serious functional or cognitive impairment," where the condition or impairment "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.*[4]

---

[3] The Court recognizes that the Sentencing Commission has not updated its policy statements since the First Step Act modified § 3582(c)(1)(A) to make prisoner-initiated motions possible. Thus, policy statements regarding Bureau-initiated motions are persuasive, but not binding, on prisoner-initiated motions. *See Andrews*, 12 F.4th at 260 (reasoning pre-First Step Act policy statements "shed[] light on the meaning of extraordinary and compelling reasons" for post-First Step Act motions).

[4] In his status report, Edwards asks the Court to "take guidance" from the Sentencing Commission's proposed changes to U.S.S.G. § 1B1.13, which would move the "Medical Condition of the Defendant" from the commentary to the Guideline itself. Status Report, ECF No.

Edwards renews his previous motion for compassionate release in light of new ailments he has suffered since his 2021 stroke: a "recent incapacitating seizure" and an "unexplained brain bleed." Renewed Mot. at 10. He argues these new developments show his health is "undoubtedly worsening," and the "prospects for any recovery at all are now uncertain, at best." *Id.* at 10–12; *see also* Reply at 3. In addition, he highlights a three-day gap in his prescribed antiseizure medication, Keppra, to argue community care, as opposed to correctional care, would be "more effective" for his "complex and evolving condition." Renewed Mot. at 11.

The Court acknowledges the seriousness of Edwards's 2021 stroke, unexpected seizure-like activity, and small hemorrhage. However, his medical reports suggest the seizure-like activity was an isolated incident from which he has fully recovered, and the hemorrhage continues to be investigated, monitored, and treated. *See United States v. Bright*, No. CR 2000-0004, 2020 WL 4495271, at *3 (D.V.I. Aug. 4, 2020) (denying compassionate release for prisoner who suffered stroke because he was "not terminal," "his condition [was] not deteriorating," and he was "receiving rehabilitative care"). While being assessed at a local hospital immediately following the seizure-like incident, Edwards was "alert" and "in no distress." ECF No. 113 at 425. When discharged from the hospital, he reported feeling "fine," having returned to his baseline. *Id.* at 27, 39. And within about a month of the incident, Edwards requested and was approved to work as a physical therapy aide. *Id.* at 1. As to the "small area of hemorrhage," *id.* at 27, medical personnel

---

118 at 4; *see also* Proposed Amendments to the Sent'g Guidelines (Feb. 2, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230201_RF-proposed.pdf. But there is no guarantee Congress will approve the amendment. *See United States v. Adair*, 38 F.4th 341, 356 (3d Cir. 2022) (describing amendment process). And proposed amendments are just that, proposals; they are not "independent legal authority" that the Court may rely upon in place of the current Guidelines and policy statements. *See United States v. Morelli*, 169 F.3d 798, 809 n.13 (3d Cir. 1999). Anyway, because the Court looks to the policy statements for guidance, it is unclear how the result in this case would differ if the policy statements were in the Guideline itself.

are monitoring the condition, *id.* at 1, 12, including scheduling follow-up care, ECF No. 123 at 30, and managing his medication, ECF No. 113 at 2, 45. Finally, while Edwards experienced an unintended "Rx gap" following his discharge from the hospital, medical personnel identified the gap and immediately renewed the Keppra prescription. *Id.* at 18–23. "No apparent harm" resulted. *Id.* at 18.

To the extent Edwards's renewed motion repeats the argument in his first motion—that suffering from chronic and lifelong conditions that require management and treatment is the same as "not expect[ing] to recover," U.S.S.G. § 1B1.13 cmt. n.1—the Court, again, rejects it. Such a conclusion not only waters down the policy statement's high burden, but it also contravenes the reality of Edwards's health situation. Following his cranioplasty, some of Edwards's residual stroke symptoms have actually improved. For example, he reported better control of his right index finger, ECF No. 113 at 80, allowing him to clean, mop, and fold towels as a rehab tech, *id.* at 62. And his medical records show he may no longer require Eliquis—the long-term anticoagulation drug he had been taking since his 2021 stroke. *Id.* at 2, 7; *see also* ECF No. 123 at 30. Notably, Edwards is back to working and participating in recreation.

In sum, many of Edwards's symptoms have improved since his unexpected stroke, he has fully recovered from his isolated seizure-like incident, and he remains under the care and supervision of medical staff for his unexplained small hemorrhage.[5] Not only does Edwards not

---

[5] For these reasons, Edwards's condition is markedly different from the condition of prisoners who were granted compassionate release in the cases he cited in his original motion and continues to cite now, Renewed Mot. at 10. *See United States v. Eubanks*, No. 3:06-CR-105-TBR, 2021 WL 3557653, at *1 (W.D. Ky. Aug. 11, 2021) (prisoner suffered multiple strokes that "rendered him bedridden with limited neurological or cognitive function, no ability to verbalize or perform any 'Activities of Daily Living' (ADL), a feeding tube, and supplemental oxygen"); *United States v. Leahy*, No. 3:16-CR-021-MMD-WGC, 2021 WL 259503, at *1 (D. Nev. Jan. 5, 2021) (prisoner had "severe mental and physical impairments [that were] not being treated properly," such as "significant brain damage resulting from massive hemorrhagic stroke" and a

require round-the-clock care, but he maintains the capacity and desire to work at the correctional facility. Thus, his medical condition is not an extraordinary and compelling reason for early release.

The same would be true if the Court looks to the dictionary definitions of "extraordinary and compelling," instead of the non-binding policy statements by the Commission. "Extraordinary" means "[b]eyond what is usual, customary, regular, or common." *Extraordinary*, Black's Law Dictionary (11th ed. 2019); *see also Extraordinary*, Merriam-Webster (online ed., last visited May 9, 2023) ("going beyond what is usual, regular, or customary"; "exceptional to a very marked extent"). While "compelling" means "demanding attention" or "convincing." *Compelling*, Merriam-Webster (online ed., last visited May 9, 2023); *see also Compelling Need*, Black's Law Dictionary (11th ed. 2019) ("A need so great that irreparable harm or injustice would result if it is not met.").

Neither of these adjectives describe Edwards's current condition. Edwards has fully recovered from his seizure-like incident and his small hemorrhage does not seem to be causing irreparable harm to his ability to work and care for himself during activities of daily living. Plus, even assuming his provisional diagnosis of epilepsy becomes definite, Edwards would join approximately 3.4 million Americans with epilepsy nationwide. *See* Ctrs. for Disease Control & Prevention, *Epilepsy Fast Facts* (Sept. 30, 2020), https://www.cdc.gov/epilepsy/about/fast-

---

"particular[] vulnerab[ility] to COVID-19"); *United States v. Jenkins*, 460 F. Supp. 3d 1121, 1129 (D. Colo. 2020) (61-year-old prisoner's "age and medical conditions, taken as a whole, make him more vulnerable to severe illness and even death from COVID-19"); *United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221, at *3–6 (E.D.N.Y. Apr. 17, 2020) (unclear if 85-year-old defendant was able to independently "speak, move, and care for himself on an ongoing basis" after suffering stroke, but defendant faced "dire" consequences from COVID-19 threat).

facts.htm.[6] Without more, it is hard to square such a diagnosis—described as "one of the most common conditions affecting the brain"—with the ordinary meaning of extraordinary. *See* Ctrs. for Disease Control & Prevention, *Frequently Asked Questions About Epilepsy* (Oct. 26, 2022), https://www.cdc.gov/epilepsy/about/faq.htm#Is%20epilepsy%20common. Edwards's incident and his recovery from the same simply do not fall within the ordinary meaning of extraordinary and compelling.

Edwards does not satisfy the "extraordinary and compelling reasons" requirement for compassionate release. Thus, his renewed motion fails, and the Court need not evaluate the § 3553(a) factors.

## IV. CONCLUSION

The Court will deny Edwards's renewed motion because he fails to establish extraordinary and compelling reasons warranting compassionate release. The denial will be without prejudice, and Edwards may file a new motion, or request reconsideration, if his circumstances change or he has evidence to show his condition is deteriorating.

An appropriate order will be entered.

BY THE COURT:<br>
s/ D. Michael Fisher<br>
United States Circuit Judge

Date:  May 9, 2023

cc:  Andrew Edwards
    USMS 11198-068
    Federal Correctional Institution Gilmer
    Inmate Mail/Parcels
    PO Box 6000
    Glenville, WV 26351-6000

---

[6] The Court takes judicial notice of the Centers for Disease Control and Prevention website. Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").